COFER, Justice,
for the Court:
This case originated in the County Court of Jackson County where on December 12, 1973, appellant Dunham-Bush, Inc. (Dun-ham) sued appellee Barron-Leggett Electric, Inc. (Barron) on an open account to which Barron filed a counterclaim for damages. The court dismissed both the declaration and the counterclaim, whereupon Barron appealed to the Circuit Court of Jackson County, where the decision of the county court was reversed and damages were awarded to Barron on its counterclaim.
Dunham appealed therefrom, assigning: that the circuit court erred in reversing the county court which was the trial court and its decision must be presumed valid; that the circuit court erred in reversing the county court for Dunham was entitled to a dismissal of Barron’s counterclaim as a matter of law; and that the circuit court erred in reversing the county court for the verdict and judgment of the trial court were supported by the evidence and the law.
We reverse the circuit court’s decision and reinstate the judgment of the county court.
Fletcher Construction Company, prime contractor in the construction of a building, Doctors Plaza, in Pascagoula, subcontracted with Barron to supply and install air conditioning for the building. Slaughter and Allred were the architects for the building and made up the plans and specifications for the project.
According to the plans and specifications, Trane air conditioners or prior approved equals were to be installed. Owing to impossibility in timely delivery of the Trane equipment, Barron negotiated with Dun-ham which furnished descriptions, pictures, capabilities, and further details on equipment such as needed by Barron.
After obtaining approval of the Dunham machinery as prior approved equal to the Trane machinery, Barron placed an order with Dunham for two 80-ton air chillers and one 15-ton air chiller and air handlers for three chillers. On the purchase order Barron wrote “all equipment and material shall be in accordance with plans and specifications and are subject to engineer’s approval.” Dunham had furnished Barron many pages of information and pages with blocks for Barron’s use in choosing among numerous alternatives in the equipment. These sheets were to be examined and understood by Barron, which was to indicate thereon choices of equipment desired, and were then to be attached to and regarded as a part of Barron’s order.
No trouble was experienced as a result of installation and use of the 15-ton chiller, but vibration from the two 80-ton chillers was such that parts of the building could not be used for their intended purpose. Barron contended that had Dunham furnished vibration absorbers for these heavier units, there would have been vibration so slight as not to be objectionable, and by its counterclaim demanded, and on appeal to *1317 the circuit court was awarded, damages incurred by it in subduing the vibration.
Dunham’s position was that Barron got the machinery it ordered, that it was not entitled to the vibration absorbers under its purchase order, and that the vibration transmission was not caused by the ordered items.
In one of its data submittal pages, under the heading of “construction details” “30 thru 125 ton models,” appear these paragraphs:
MOTOR COMPRESSORS — D/B-metic, Big 4, and Multidrive compressors are in the “ARPC” units in this capacity range. These large horsepower compressors combine the reliability and the ruggedness required of large reciprocating machines. All semi-hermetic compressors motors are suction gas cooled and are equipped with temperature and current sensing overload protection.

D/B-Metic and multi-drive compressors are mounted on vibration isolators and are provided with discharge line vibrasor-bers installed parallel to the compressor crankshaft.

and
For further details on these compressors, refer to the following forms: D/B-Metic, Form 4030; Big 4, Form 4055; Multi-Drive, Form 4020.
On a sheet of the submittal data entitled “Mechanical Specifications, 'ARPC’ air cooled package chillers, 30 tons through 125 tons,” there appears a block to be checked if unit vibration isolators were desired and a blank line for the type of such isolator if desired. It was left blank. On a page “optional accessories,” it is said:
UNIT VIBRATION ISOLATION— where job conditions require them, unit vibration isolators may be supplied. Rubber-in-shear type with approximately .4" of deflection are adequate for units mounted on a solid foundation. For less rigid foundations, such as normal roof structures, steel spring isolators with approximately 1" of deflection are recommended. Where isolation requirements are critical, the isolation system should be analyzed and recommendations made by isolation specialists. Dunham-Bush can then provide the required mounting.
Joe Schwegman, in charge of Barron’s mechanical operations at the pertinent times, drew a circle in red pencil on one of the drawings to indicate where the isolator would be. Another page of the submittal data identified as “addendum to contract,” contains drawings under which arrows point to what the sheet identifies as “support points and vibration isolation locations.”
Under these circumstances, Barron placed its order without making a full examination of the submittal data, without specifically choosing between the D/B-Metic, Big 4, and Multi-Drive Compressors, and without indicating a desire to have vibration absorbers as optional equipment. Dunham considered that the Big 4 was most suited for the systems it was selling to Barron, and used it as the compressor. As set out above, Big 4 is the only one of the three available choices not mounted on vibration isolators. No material difference in the prices of the three compressors seemed to have existed or to have influenced Barron to make no choice among them or to have influenced Dunham to utilize the Big 4.
The record shows that the Dunham-sub-mittal data were sent to the owner for which the building was being constructed by way of the general contractor and the architect, and they approved the equipment. The witness Schwegman said he reviewed the submittal data and did not see that vibration isolators were not included on the chillers; he did not examine the equipment when it was received; Barron talked to no vibration isolation specialist before placing the order; it did not inquire of Dunham if the compressors had vibration isolators because he assumed they did; Barron did not follow any recommendations with respect to the optional equipment, which option page has been hereinbefore noticed, nor were any recommendations with respect to vibration *1318 isolators included in the installation of the units. From their arrival from Dunham the units remained crated until Barron was ready to install them, and those persons, including the engineer who had a duty as to them, did not inspect the units before their installation.
Schwegman testified that Dunham did not inform him as to the type of compressor being supplied and, since it was supposed to be isolated, he assumed the units would have compressors that Dunham’s submittal data said were equipped with isolators, a supposition, he said, based on the plans and specifications: “You can’t go over every word of every submittal data that you get. It would be so monsterous (sic) you could never do it. It would be impossible.”
From the record the conclusion is warranted that the vibration from these units was the result, to some degree, of failure to include isolators and that the transmission of noise and vibration into the building to the disturbing level complained of was caused by failure on the part of the responsible parties to use building materials of such nature and manner of location and installation as to eliminate or reduce to an acceptable level this transmission. Neither the vibration nor its transmission into the building resulted from any omitted duty of Dunham.
There were claims by Barron of $614.24 and $96.86, balances, for repairs, etc., to the equipment caused by breach of warranty as to its fitness, etc., on purchase. These claims were denied by Dunham and the county judge dismissed the counterclaim wholly on the record made, from which he, no doubt, concluded Barron had not proved damages for breach of warranty by the measure of evidence necessary to recovery.
The county judge was the trier of the facts, and did try them, and arrived at the conclusion that neither party was entitled to recover any amount by its suit. Unless prejudicial error appears in his findings and decisions, then affirmance would be proper. We have carefully examined the record, and are convinced that the county judge did not commit prejudicial error, but rather that his decision of the case had sound basis in the testimony before him. Mississippi Code Annotated § 11-51-79 (1972).
The judgment of the circuit court will be reversed, and the county court’s judgment denying relief to Barron will be reinstated.
REVERSED AND RENDERED.
PATTERSON, C. J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.